## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,
    *Plaintiff*,

    v.

WILLIAM ROBINSON,
    *Defendant*.

Criminal No. ELH-18-17

## MEMORANDUM OPINION

William Robinson, defendant, was convicted in 2018 of conspiracy to distribute heroin, for which he is serving a sentence of 144 months' imprisonment at FCI Cumberland, with credit dating to January 17, 2018. ECF 239. Through counsel, Robinson submitted an "Emergency Motion for Compassionate Release" (ECF 773), supported by a memorandum (ECF 775) (collectively, the "Motion") and exhibits. The government opposes the Motion. ECF 788. Defendant replied. ECF 794.

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall deny the Motion.

### I. Background

Defendant was indicted on January 11, 2018, along with 18 others. ECF 1. A superseding indictment was filed on March 22, 2018. ECF 157. In particular, defendant was charged with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 846 (Count One). The offense carries a mandatory minimum term of imprisonment of ten years, with a maximum of life imprisonment. *See id.* ¶ 3.

Robinson entered a plea of guilty to Count One on June 26, 2018 (ECF 237), pursuant to a Plea Agreement. ECF 201. The plea was tendered under Rule 11(c)(1)(C), by which the parties

agreed to a sentence of 144 months' imprisonment. *Id.* ¶ 8.

The Plea Agreement included a stipulation of facts. *Id.* ¶ 6(a). According to the stipulation, defendant was "the leader" of the drug distribution ring known as the "Good Pussy" heroin shop (*i.e.*, the "GP heroin shop"). *Id.* From March 2017 to January 2018, he conspired with others "to obtain wholesale quantities of heroin and distribute . . . that heroin at the street-level." *Id.* Law enforcement conducted a wiretap investigation in which defendant was heard "coordinat[ing] shop operations with other members of his organization, and his source of supply . . . ." *Id.* Using pole cameras, law enforcement captured video evidence of Robinson and his co-conspirators engaged in drug trafficking, including footage of them picking up "packs of heroin" and then "selling heroin to waiting customers." *Id.*

In the Plea Agreement, the parties agreed that defendant qualified as a career offender under § 4B1.1(b) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). *Id.* ¶ 6(b). And, the parties contemplated a final offense level of 34, along with a Criminal History Category of VI. *Id.* ¶ 6(b), (c).

Consistent with the Plea Agreement, the Amended Presentence Investigation Report (ECF 238, "Amended PSR") indicates that the defendant qualified as a career offender because of at least two prior convictions for felony drug offenses. *Id.* ¶ 36. It reflects a final offense level of 34 and a Criminal History Category of VI. *Id.* ¶¶ 21, 35. Robinson's advisory sentencing Guidelines called for a sentence ranging between 262 and 327 months of imprisonment. *Id.* ¶ 68.

Sentencing was held on June 26, 2018. ECF 237. At the time of sentencing, Robinson, who was born in October 1970, was forty-seven years old. ECF 238 at 3. With respect to the defendant's health, the Amended PSR reflected that defendant had high blood pressure, for which he was prescribed medication. *Id.* ¶¶ 50, 52. The defendant also "indicated he had a 'semi-heart

attack' in 2008 as a result of using some 'bad heroin.'" *Id.* ¶ 50.

The Amended PSR also reflected that defendant has a long history of drug abuse, dating to age 16. *Id.* ¶ 56. He participated in several drug treatment programs. *Id.* ¶¶ 57, 58.

According to the Amended PSR, Robinson has an extensive history of drug convictions in State court. *See id.* ¶¶ 24-33. Several of those convictions involved drug possession. *See id.* ¶¶ 24-26, 29. But, others concerned drug distribution. In 1991, defendant was convicted of unlawful manufacturing of a controlled substance and was sentenced to ten years' imprisonment, all of which was suspended. *Id.* ¶ 27. He violated his probation and received a sentence of ten years, with all but two years suspended. *Id.* After his release, defendant again violated probation, and received the balance of his sentence, *i.e.*, eight years of imprisonment. *Id.*

In 1995, Robinson was convicted of possession with intent to distribute and was sentenced to three years' incarceration. *Id.* ¶ 28. He received a one-year sentence in 1998 for drug possession. *Id.* ¶ 29. In 2002, defendant was convicted of possession with intent to distribute heroin and was sentenced to four years' imprisonment. *Id.* ¶ 30. In 2007, Robinson was convicted of possession with intent to distribute and was sentenced to five years' incarceration. *Id.* ¶ 31. However, the sentence was later reduced. *See id.* And, in 2012 Robinson was convicted of his fifth felony drug distribution offense. *Id.* ¶ 33. He received a sentence of fifteen years' imprisonment, with all but five days suspended. *Id.* He was entered into a drug treatment program, in lieu of incarceration. *Id.*

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Court imposed a twelve-year sentence, with credit dating to January 17, 2018. ECF 239; ECF 240. Robinson's sentence was well below the advisory sentencing Guidelines range.

In his Plea Agreement, Robinson waived most of his rights to appeal. ECF 201, ¶ 11.

Nevertheless, he filed a Notice of Appeal. ECF 245. The Fourth Circuit affirmed in part and dismissed in part. *See* ECF 534, ECF 555.

The parties indicate that Robinson is currently serving his sentence at FCI Cumberland. *See* ECF 775 at 1; ECF 788 at 1. It is a medium-security institution. Robinson has served approximately twenty-five percent of his sentence. Neither side has provided defendant's projected release date.[1]

According to defendant, while incarcerated he has "completed numerous Adult Continuing Education (ACE) classes, drug education, and passed two portions of the Maryland State GED classes." ECF 775 at 19. The government points out that defendant has incurred two disciplinary infractions, both in 2020. ECF 788 at 20. One infraction resulted from defendant's failure to wear a mask properly, as required by prison safety regulations. *See id.*; ECF 788-1. The other infraction was for possession of a non-hazardous tool. *See* ECF 788 at 20; ECF 788-1.

Robinson submitted a request for compassionate release to the Warden on April 19, 2020. ECF 775-1. The request was promptly denied. *Id.*

## II. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is

---

[1] Curiously, the Bureau of Prisons ("BOP") website indicates that Robinson is currently serving his sentence at FCI Fort Dix. *See Find an inmate*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited January 31, 2021). And, it reflects a projected release date of April 2028.

"expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was adopted as part of the Sentencing Reform Act of 1984.  It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA").  *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020).  As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  So, once a defendant has exhausted his administrative remedies, he may

petition a court directly for compassionate release. *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to qualify for relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release. *See McCoy*, 981 F.3d at 276. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018. *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§

1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)  **Medical Condition of the Defendant**.—
>
> > (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> >
> > (ii) The defendant is—
> >
> > > (I)  suffering from a serious physical or medical condition,
> > >
> > > (II) suffering from a serious functional or cognitive impairment, or
> > >
> > > (III) experiencing deteriorating physical or mental health because of the  aging process,
> >
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence.  Application Note 1(C) concerns Family Circumstances.  Application Note 1(D), titled "**Other Reasons**," permits the court to reduce

a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. However, the Court may not rely on the Program Statement.  Rather, the Court must consider the Sentencing Commission's policy statements. *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").  However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act.  Thus, it is only "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13).  In other words, "[b]y its plain terms…§ 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at *7; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283.   Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'"   *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020).  If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 826-27; *see also United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).   But, compassionate release is a "rare" remedy.  *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III.  COVID-19[2]

Defendant filed his Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[3]  The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*

That said, the COVID-19 pandemic is the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").  The pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *stayed*, 818 Fed. App'x 393, (6th Cir. 2020).  Indeed, for a significant period of time, life as we have known it came to a halt.

---

[2] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[3] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

Although many businesses and schools reopened for a period of time, many are again subject to closure or substantial restrictions, due to the virulent resurgence of the virus in recent weeks.

The Court must also underscore that the virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. To be sure, many people who are stricken with the virus experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 2020 WL 2556496, at *1 (citation omitted). As of January 31, 2021, COVID-19 has infected more than 26 million Americans and caused over 441,000 deaths in this country. *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Jan. 31, 2021).

Unfortunately, there is currently no cure or proven treatment that is generally available for the virus. But, the country has recently seen the rollout of two vaccines for COVID-19 (Pfizer and Moderna). The vaccines initially were made available to health care workers and the elderly in nursing homes, but the category of eligible persons has expanded recently. Nevertheless, the rollout has not been as expeditious as had been hoped.

Notably, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) is "align[ed] with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Therefore, prisoners at heightened risk receive priority for receipt of the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.   According to a press release dated January 15, 2021, the BOP has administered 17,189 vaccine doses to staff and inmates at sixty-eight BOP institutions.  *Update on COVID-19 Vaccinations*, U.S. DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF PRISONS (Jan. 15, 2021), https://www.bop.gov/resources/news/pdfs/20210115_press_release_vaccination.pdf (last accessed January 19, 2021).  As of January 15, 2021, 1,027 staff and 1,051 inmates have received a series of two doses.  *Id.*

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that increase the chance of severe illness.  Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, and again on July 17, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. Then, on November 2, 2020, to reflect the most recently available data, the CDC again revised its guidance.  *See People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 2, 2020), https://bit.ly/38S4NfY.   According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; COPD; being immunocompromised; obesity, where the body mass index ("BMI") is 30 or higher; serious heart conditions, including heart failure and coronary artery

disease; sickle cell disease; smoking; pregnancy; and Type 2 diabetes. *Id.* The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

In addition, the CDC created a second category for conditions that "might" present a risk for complications from COVID-19. The factors that might increase the risk include asthma, cerebrovascular disease, hypertension, liver disease, cystic fibrosis, neurologic conditions, a compromised immune system, overweight (where the BMI is between 25 and 30), pulmonary fibrosis, thalassemia (a type of blood disorder), and Type 1 diabetes. *See id.*

Thus far, the only way to slow the spread of the virus is to practice "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2. Prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate themselves from others. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons,

jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and employees of the BOP from COVID-19.  The DOJ has adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, the Attorney General issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL

3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the BOP has implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

As with the country as a whole, the virus persists in penal institutions.[4]  As of January 21, 2021, the BOP had 123,221 federal inmates and 36,000 staff.  And, as of the same date, the BOP reported that 3,117 inmates and 1,782 BOP staff currently tested positive for COVID-19; 42,671 inmates and 4,321 staff have recovered from the virus; and 210 inmates and three staff members have died from the virus.  Moreover, the BOP has completed 101,224 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/ (last accessed Jan. 31, 2021).  *See COVID-19*, FED. BUREAU OF PRISONS, https://bit.ly/2XeiYH1.

---

[4] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2. More recently, on October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.  *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems.*" America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

With respect to FCI Cumberland, where the defendant is a prisoner, as of January 31, 2021, the BOP reported that fifty-six inmates and ten staff have tested positive for COVID-19 and 320 inmates and 40 staff have recovered at the facility.  And, the facility has completed 980 tests. There have been no reported deaths.  *See* https://www.bop.gov/coronavirus/ (last accessed Jan. 31, 2021).

## IV.  Discussion

Robinson, now fifty years of age, has moved for compassionate release on the ground that his health conditions render him particularly vulnerable to COVID-19.  *See* ECF 775 at 7. In particular, defendant avers that he suffers from "hypertension (accompanied by high cholesterol), history of heart attack, and history of smoking."  ECF 775 at 8.  As Robinson notes, the CDC classifies hypertension as a condition that "might" increase the risk of complications due to COVID-19.  *Id.* at 8.

Further, defendant asserts that he "appears to be suffering from an unidentified condition that has resulted in the sudden onset of unintended and unexplained weight loss of nearly 40 pounds over the course of one year despite 'eating well' and having 'a good appetite.'"  *Id.* (quoting one of defendant's medical records docketed at ECF 775-3 at 17).  Moreover, defendant contends that he is not a danger to the community and that the factors under 18 U.S.C. § 3553(a) favor his release.  *Id.* at 16-20.

The government opposes Robinson's Motion at each step of the analysis. It contends that although the health conditions claimed by defendant "*might* result in a higher risk of COVID-19, the actual risk to Robinson is speculative."  ECF 788 at 16 (emphasis in original).  Moreover, the government maintains that Robinson is a danger to the public and that the § 3553(a) factors militate against a reduction of his sentence.  *Id.* at 18-23.

**A. Extraordinary and Compelling Reasons**

As noted, the Amended PSR reflects that as of 2018 Robinson had hypertension.  He has submitted BOP medical records from 2019 that indicate that he is prescribed medication for the condition.  *See* ECF 775-3 at 3, 9. As to the sudden weight loss, defendant asserts that during the same period he also has experienced abdominal pain.  His medical records reflect that the symptoms have not been diagnosed and that they "have an unclear etiology."  *Id.* at 20.

According to defendant, the results of blood tests conducted on May 10, 2019, reveal elevated levels of "hemoglobin A1C," which "suggest the development of Type II diabetes — a condition known to increase a person's risk from COVID-19."  ECF 778 at 9.  Robinson "is concerned that these abnormal blood test results combined with his significant unexplained weight loss and abdominal pain are an indication of a serious undiagnosed illness."  *Id.*  In addition, defendant asserts that "that he has not had additional blood testing or further evaluation of his abnormal results in over a year."  *Id.*

Robinson has submitted a report of W. Anthony Gerard, M.D., an Assistant Clinical Professor of Family Medicine at Penn State Hershey and a family physician with thirty years' experience.  ECF 775-6 at 1.  In the report, Dr. Gerard opines on the significance of Robinson's undiagnosed symptoms and on his vulnerability to COVID-19.  *Id.* at 1-4.   Dr. Gerard characterized Robinson's symptoms as "chronic abdominal pain" (*i.e.*, "CAP"), which "is a diagnostic challenge" and requires "an extensive workup to look for organic causes."  *Id.* at 1. According to Dr. Gerard, defendant "needs more diagnostic testing, and specialty referrals to be sure he does not have a serious disease."   For example, defendant has not "seen a gastroenterologist," which would be the "next step . . . to meet even a minimum standard of care." *Id.* at 2.  Based on defendant's CAP-related symptoms, as well his hypertension and smoking

history, Dr. Gerard opined "that COVID-19 poses a severe risk" to defendant.  *Id.* at 3; *see id.* at 2.

The government does not dispute Dr. Gerard's opinion or raise concerns about the Court's ability to consider them.  Rather, the government asserts that Dr. Gerard "was unable to make any conclusions" regarding defendant's weight loss and abdominal pain and only opined that defendant "would receive better treatment for this undiagnosed condition, outside of jail."  ECF 788 at 15-16.  And, as noted, the government characterizes as "speculative" the "actual risk" COVID-19 poses to defendant, on the basis of his multiple health conditions.  *Id.* at 16.

Given the clear documentation of defendant's hypertension, I need not further address the significance of Robinson's weight loss and abdominal pain.  Numerous courts have found that, in light of the COVID-19 pandemic, hypertension, along with other conditions, qualifies as a compelling reason for compassionate release.  *See, e.g., United States v. Gutman*, RDB-19-0069, 2020 WL 24674345, at *2 (D. Md. May 13, 2020) (finding defendant's age of 56 years, multiple sclerosis, and hypertension satisfied extraordinary and compelling reason); *United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296, at *7 (C.D. Ill. Apr. 24, 2020) (granting compassionate release to defendant with hypertension, prediabetes, prostate issues, bladder issues, and a dental infection); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason); *see also, e.g., United States v. Hilow*, No. 15-170-JD, 2020 WL 2851086, at *4 (D. N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Ullings*, 1:10-CR-00406, 2020 WL 2394096, at *4 (N.D. Ga. May 12, 2020) (finding defendant's age, hypertension, and obesity constituted an extraordinary and compelling reason); *United States v. Foreman*, 3:19-CR-62 (VAB), 2020 WL 2315908, at *4 (D. Conn. May

11, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason). *But see United States v. Wright*, Nos. TDC-17-388, TDC-19-35, 2020 WL 2571198, at *3 (D. Md. May 21, 2020) (denying compassionate release to defendant with diabetes, hypertension, chronic kidney disease, asthma, and obesity); *United States v. Barringer*, PJM-13-0129, 2020 WL 2557035, at *4 (D. Md. May 19, 2020) (denying compassionate release to defendant with hypertension, diabetes, chronic kidney disease, and extreme obesity).

Accordingly, I am satisfied that Robinson satisfies the "extraordinary and compelling" prong of the § 3582 analysis.  However, satisfaction of the "extraordinary and compelling" prong does not end the inquiry.

## B.  Sections 3142(g) and 3553(a)

Relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).  To determine whether a defendant is a danger to the community, the Court must consider the factors under 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community.

In addition, the Court must consider the factors set forth in 18 U.S.C. § 3553(a), as required by 18 U.S.C. § 3582(c)(1)(A).  These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

Robinson underscores that his offense "involved neither weapons nor allegations of

19

violence." ECF 775 at 16.  He also highlights his participation in rehabilitation and educational programming while incarcerated.  *Id.* at 19.  And, defendant adds that he has a promising release plan: he would live with his wife and children and work with a "non-profit organization called Step Forward," which provides addiction recovery support services.  *Id.* at 20.

In addition, defendant essentially asks the Court to revisit the plea agreement in light of a subsequent change in the law.  He states that his plea agreement "was negotiated on the belief that [he] qualified as a career offender."  *Id.* at 16.  However, he points out that after he was sentenced, the Fourth Circuit held in *United States v. Norman*, 935 F.3d 232 (4th Cir. 2019), that "drug conspiracy offenses," including the offense that gave rise to this sentence, "categorically fail to qualify as a 'controlled substance offense' under the Guidelines in order to trigger a career offender enhancement."  ECF 775 at 16.  Thus, defendant posits that the plea negotiations were predicated on a career offender enhancement that would no longer apply to him.  *See id.* at 16-17.

At the time of defendant's offense, the offense of conspiracy to distribute a controlled substance under 21 U.S.C. § 846 was considered a qualifying career offender predicate offense under U.S.S.G. § 4B1.2(b).  But, in *Norman*, 935 F.3d at 237-38, the Fourth Circuit determined that a federal drug conspiracy offense under 18 U.S.C. § 846 is categorically not a qualifying offense for career offender purposes.

The government does not respond to the defense argument regarding *Norman*, 935 F.3d 232.  Rather, the government urges the conclusion that Robinson "poses a serious danger to the community."  ECF 788 at 19.  In support, the government emphasizes the nature and circumstances of the underlying offense as well as defendant's criminal history, which includes five previous State-court convictions for felony drug offenses.  *Id.*  Moreover, the government points to the defendant's two disciplinary infractions in FCI Cumberland.  *Id.* at 20.  In particular, the

government stresses that the infraction for improper mask usage demonstrates that defendant "is not even taking the proper measures to protect himself or other persons . . . ." *Id.*

Defendant would not qualify today as a career offender, in light of *Norman*. However, defendant was the leader of a serious drug trafficking organization. And, the distribution of at least one kilogram of heroin was foreseeable to him. ECF 201, ¶ 6(a). I agree with the government that the nature of Robinson's offense weighs heavily here.

If defendant were not deemed a career offender, he might have had a final offense level of 27 and a criminal history category of IV. *See* ECF 238, ¶¶ 12, 19, 20, 35. The Guidelines would have called for a sentence ranging from 100 to 125 months. But, in view of the mandatory minimum term of ten years, the Guidelines would have been adjusted to 120 to 125 months. *See* U.S.S.G. § 5G1.1(c)(2). Moreover, the government certainly could have sought a four-level role enhancement under U.S.S.G. § 3B1.1(a), given that defendant agreed that he was the leader of a large drug trafficking organization. Then, with an offense level of 31 and a Criminal History Category of IV, the Guidelines would have called for a period of incarceration ranging from 151 to 188 months.

Even if Robinson is correct that, under *Norman*, 935 F.3d 232, he is not a career offender, he nevertheless overlooks other pertinent aspects of his background. The Amended PSR reflects nine prior convictions between 1989 and 2012. *See* ECF 238, ¶¶ 24-31, 33.[5] The criminal justice system was consistently lenient with the defendant; he received multiple suspended sentences or short sentences. *See, e.g.*, *id.* ¶¶ 24-27, 31, 33. And, there is parole in the Maryland state system. For example, ECF 238, ¶ 30 reflects that defendant was mandatorily released after serving just over two years of a four-year sentence. Yet, defendant continued down the wrong path.

---

[5] Not all prior offenses scored points.

21

Given the gravity of the underlying offense, including defendant's role as a leader, coupled with defendant's prior criminal record, a 12-year sentence was entirely justified under 18 U.S.C. § 3553(a).

The Court concludes that release under 18 U.S.C. § 3582(c)(1)(A) is not warranted at this time.

## V.  Conclusion

For the forgoing reasons, I shall deny the Motion (ECF 773, ECF 775), without prejudice. An Order follows, consistent with this Memorandum Opinion.

Date:  February 3, 2021                          _____/s/_____
                                                 Ellen Lipton Hollander
                                                 United States District Judge