IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

    *Plaintiff*,

    v.

WILLIAM ROBINSON,

    *Defendant*.

Criminal No. ELH-18-17

**MEMORANDUM OPINION**

Defendant William Robinson has filed a third "Motion For Compassionate Release/Reduction In Sentence Pursuant To [18] U.S.C. [§] 3582(c)(1)(A)(i)." ECF 1195. Robinson, who is self-represented, is currently serving a 144-month sentence for the offense of conspiracy to distribute one kilogram or more of heroin, with credit for time served since January 17, 2018. ECF 239 (Judgment).[1] The government opposes the motion. ECF 1211. And, it has submitted extensive prison medical records for defendant. *See* ECF 1213. Robinson has twice replied. ECF 1218; ECF 1225. I shall refer collectively to defendant's submissions at ECF 1195, ECF 1218, and ECF 1225 as the "Motion."

In the Motion, Robinson advances a host of contentions. These include, *inter alia*, the claim that defendant's health conditions warrant a sentence reduction (ECF 1195 at 4-5); his criminal case was improperly "'Fast Tracked'"; he has been rehabilitated by his participation in many prison programs, including the RDAP program (*id.* at 5-6); he has a stable home plan (*id.* at

---

[1] On October 24, 2023, the Office of the Federal Public Defender filed a notice stating that it would not be supplementing the Motion. *See* ECF 1200.

6); he has been a drug abuser since age sixteen but has been drug free since his arrest,[2] has a new outlook, and has participated in several drug treatment programs (*id.*); his sentence reflects sentencing disparity (*id.* at 7); and he received ineffective assistance of counsel (*id.*).  Moreover, he asserts, *id.* at 3:  "Congress deliberately empowered sentencing judges to mitigate criminal justice inequities."  Defendant seeks a 24-month reduction in his sentence.  ECF 1218 at 2.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall reduce defendant's sentence to 132 months of imprisonment.

## I.  Background

Defendant was indicted on January 11, 2018, along with eighteen others.  ECF 1.  A Superseding Indictment was filed on March 22, 2018.  ECF 157.  In particular, defendant was charged with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 846 (Count One).  The offense carries a mandatory minimum term of imprisonment of ten years, with a maximum of life imprisonment.  *See id.* ¶ 3.

Robinson entered a plea of guilty to Count One on June 26, 2018 (ECF 237), pursuant to a Plea Agreement.  ECF 201.  Notably, the plea was tendered under Rule 11(c)(1)(C), by which the parties agreed to a sentence of 144 months of imprisonment.  *Id.* ¶ 8.

The Plea Agreement (ECF 201) included a stipulation of facts.  *Id.* ¶ 6(a).  According to the stipulation, defendant was "the leader" of the drug distribution ring known as the "Good Pussy" heroin shop.  *Id.*  From March 2017 to January 2018, he conspired with others "to obtain wholesale quantities of heroin and distribute . . . that heroin at the street-level."  *Id.*  Law enforcement conducted a wiretap investigation in which defendant was heard "coordinat[ing] shop operations

---

[2] Defendant's medical records, discussed *infra*, cast doubt on this assertion.  *See*, *e.g.*, ECF 1213 at 18.

with other members of his organization, and his source of supply . . . ." *Id.*  Using pole cameras, law enforcement captured video evidence of Robinson and his coconspirators engaged in drug trafficking, including footage of them picking up "packs of heroin" and then "selling heroin to waiting customers." *Id.*

In the Plea Agreement (ECF 201), the parties agreed that defendant had a base offense level of 30, pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines").  *Id.* ¶ 6(b).  It was based on the amount of drugs foreseeable to defendant as part of the conspiracy.  *Id.* They also agreed that defendant qualified as a career offender under § 4B1.1(b) of the Guidelines, which increased his offense level from 30 to 37.  *Id.*  And, after three deductions for acceptance of responsibility under U.S.S.G. § 3E1.1, the parties contemplated a final offense level of 34, along with a Criminal History Category of VI.  *Id.*, ¶¶ 6(b), (c).

Consistent with the Plea Agreement, the Amended Presentence Investigation Report (ECF 238, "PSR") determined that the defendant qualified as a career offender under U.S.S.G. § 4B1.1(b) because he had at least two prior and distinct convictions for felony drug offenses.  *Id.* ¶ 36.  After deductions for acceptance of responsibility under U.S.S.G. § 3E1.1, the PSR reflects a final offense level of 34.  *Id.* ¶ 21.

Defendant's prior record included several offenses that did not score points.  *See* ECF 238, ¶¶ 24, 25, 26, 27, 28, 29.  As to those prior offenses that did score points, defendant had 8 points. *Id.* ¶ 34.  Ordinarily, this would equate to a Criminal History Category of IV.  *Id.* ¶ 35.  But, because defendant qualified as a career offender, he had a Criminal History Category of VI, pursuant to U.S.S.G. § 4B1.1(b).  *Id.* ¶ 36.

With a final offense level of 34 and a Criminal History Category of VI, Robinson's advisory sentencing Guidelines called for a sentence ranging between 262 and 327 months of

imprisonment. *Id.* ¶ 68. If defendant were not a career offender, however, he would have had a final offense level of 27, with a Criminal History Category of IV. Ordinarily, under that scenario, his Guidelines range would have been 100 to 125 months of imprisonment. But, as noted, the offense carried a mandatory minimum term of imprisonment of 120 months. As a result, under U.S.S.G. § 5G1.1, the Guidelines would have been 120 to 125 months of incarceration.

Sentencing was held on June 26, 2018. ECF 237. At the time of sentencing, Robinson, who was born in October 1970, was forty-seven years old. ECF 238 at 3. He did not have a high school diploma or a GED. *Id.* at 3. With respect to the defendant's health, the PSR reflected that defendant had high blood pressure, for which he was prescribed medication. *Id.* ¶¶ 50, 52. The defendant also "indicated he had a 'semi-heart attack' in 2008 as a result of using some 'bad heroin.'" *Id.* ¶ 50.

Further, the PSR reflected that defendant has a long history of drug abuse, dating to age sixteen. *Id.* ¶ 56. He had participated in several drug treatment programs. *Id.* ¶¶ 57, 58.

Moreover, the PSR recounted an extensive history of drug convictions in State court. *Id.* ¶¶ 24-33. Although several of those convictions involved drug possession, others involved felony drug distribution.

In 1991, defendant was convicted of the unlawful manufacture of a controlled substance. *Id.* ¶ 27. The offense itself occurred in 1990, when Robinson was 20 years old. *Id.* He was sentenced to ten years' imprisonment, all of which was suspended. *Id.* However, in 1993 defendant violated his probation and received a sentence of ten years, with all but two years suspended. *Id.* He was paroled in 1994. *Id.* Then, in July 1995, Robinson was found in violation of his probation and received the balance of his sentence, *i.e.*, eight years of imprisonment. *Id.* He

4

was released in October 2000.  *Id.*[3]  This sentence—a little more than five years—appears to have been the longest State sentence that defendant ever served.

Also in 1995, Robinson was convicted of possession with intent to distribute a controlled substance.  *Id.* ¶ 28.  The offense itself occurred in November 1994.  *Id.*  Defendant was sentenced to three years of incarceration.  *Id.*[4]

Defendant received a one-year sentence in 1998 for drug possession.  ECF 238, ¶ 29.  In March 2002, defendant was convicted of possession with intent to distribute heroin.  *Id.* ¶ 30.  The offense occurred in September 2001, when defendant was 30 years old.  *Id.*  He was sentenced to four years' imprisonment.  *Id.*  Defendant was released in July 2004.  *Id.*

In January 2007, Robinson was convicted of possession with intent to distribute heroin.  *Id.* ¶ 31.  The offense occurred in November 2005.  *Id.*  Defendant was sentenced to five years' incarceration.  *Id.*  However, in October 2008, the sentence was modified.  *See id.*  As to the five years of imprisonment, the Court suspended three years, two months, and ten days.

Robinson was convicted of his fifth felony drug distribution offense in March 2012.  *Id.* ¶ 33.  The offense occurred in November 2011, when defendant was 41 years of age.  *Id.*  He received a sentence of fifteen years' imprisonment, with all but five days suspended.  *Id.*  In lieu of incarceration, however, defendant entered a drug treatment program, from which he graduated in December 2013.  *Id.*

---

[3] In the State system, defendants are generally eligible for parole after serving a portion of their sentence.

[4] The offense may have led to the probation violation referenced in ECF 238, ¶ 27.  The two sentences appear to have run concurrent.  *See id.*

As noted, in this case, pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Court imposed a twelve-year sentence, with credit dating to January 17, 2018.  ECF 239; ECF 240.  Robinson's sentence was well below the advisory sentencing Guidelines range.

In his Plea Agreement, Robinson waived most of his rights to appeal.  ECF 201, ¶ 11. Nevertheless, he filed a Notice of Appeal.  ECF 245.  The Fourth Circuit affirmed in part and dismissed in part.  *See* ECF 534, ECF 555.

Robinson is currently incarcerated at Lexington FMC.  *Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited May 2, 2024).[5]  The Bureau of Prisons ("BOP") indicates that defendant has a projected release date of July 14, 2027.  With credit for pretrial detention dating from January 17, 2018, Robinson has served about 75 months of his 144-month sentence, which is a little more than 50% of his sentence.

Through counsel, Robinson filed his first motion for compassionate release on October 12, 2020.  ECF 773.  By Memorandum Opinion (ECF 889) and Order (ECF 890) of February 3, 2021, I denied that motion.  I recognized that, in light of the COVID-19 pandemic, defendant's health conditions presented an extraordinary and compelling reason to qualify Robinson for relief.  ECF 889 at 19.  Nonetheless, I found that the serious nature of Robinson's offense, coupled with his extensive criminal history, weighed heavily against his release.  *Id*. at 22.

On August 20, 2021, Robinson, pro se, filed a second motion for compassionate release. ECF 962.  He noted that he contracted COVID-19 on or about February 16, 2020, and that, in light of his chronic medical conditions, he experienced an elevated risk of severe illness. *Id.* at 3-4.  He also asserted that he is afflicted with multiple health conditions.   *Id.* at 3.

---

[5] The government's response (ECF 1211 at 1) states that defendant "is currently serving his sentence at FCI Cumberland . . . ."

The government conceded that Robinson's medical conditions conferred threshold eligibility for compassionate release. ECF 1006 at 17, 19. But, it argued that defendant "no longer presents an 'extraordinary and compelling reason' because he has been vaccinated" for COVID-19. *Id.* at 19. According to defendant's medical records, Robinson received his second dose of the Pfizer vaccine on July 9, 2021. ECF 1006-1 at 37. Further, the government noted that Robinson has already contracted COVID-19 and recovered from it, without significant consequence. *Id.* at 25; *see* ECF 1006-1 at 17. And, in any event, the government argued that the sentencing factors in 18 U.S.C. § 3553(a) supported a denial of relief. ECF 1006 at 28-31.

By Memorandum Opinion (ECF 1135) and Order (ECF 1136) of November 23, 2022, I denied defendant's second motion for compassionate release (ECF 962). Although I again concluded that defendant's medical conditions satisfied the "extraordinary and compelling prong" of the § 3582 analysis (ECF 1135 at 27), I determined that the § 3553(a) factors militated against defendant's release. *Id.* at 29.

Additional facts are included, *infra*.

## II.  The First Step Act of 2018

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Davis*, ___ F.4th ___, 2024 WL 1662931, at *2 (4th Cir. Apr. 18, 2024); *United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023); *United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson*, 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020), *abrogated on other grounds by United States v. Troy*, 64 F.4th 177 (4th Cir. 2023); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020);

*United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011).

When a sentence modification is "expressly permitted by statute", this constitutes an exception to finality. *See* 18 U.S.C. § 3582(c)(1)(B); *see also Jackson*, 952 F.3d at 495. Of relevance here, "Congress created an exception" to the general rule of finality in December 2018, with the passage of the First Step Act ("FSA" or "2018 FSA"). *See* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)); *see also Davis*, 2024 WL 1662931, at *2. With the passage of the 2018 FSA, Congress "broadened" the authority of courts to grant sentencing modifications, pursuant to 18 U.S.C. § 3582. *Malone*, 57 F.4th at 173.

Section 3582 of Title 18 of the United States Code was first enacted as part of the Sentencing Reform Act of 1984. As originally enacted, it permitted a court to alter a sentence only upon motion of the Director of the Bureau of Prisons. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). This meant that a defendant seeking compassionate release had to rely on the BOP Director for relief. *See Bethea*, 54 F.4th at 831; *see, e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866–67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP). However, the BOP rarely filed such a motion on an inmate's behalf. Thus, compassionate release was an infrequent occurrence. *See Hr'g on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

As a result of the enactment of the FSA in December 2018, however, federal inmates are now permitted to file their own motions for compassionate release directly with the court, so long

8

as the inmate first exhausts administrative remedies.  *Ferguson*, 55 F.4th at 267-69; *Davis*, 2024 WL 1662931, at *2; *see also United States v. McCoy*, 981 F.3d 271, 275–76 (4th Cir. 2020). Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes a court to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194.  This provision is an exception to the ordinary rule that a federal sentence is final.  *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

In particular, the 2018 FSA authorizes a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. 18 U.S.C. § 3582(c)(1)(A).  That is, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release.  *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.

Nonetheless, there are restrictions.  Under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met.  *Brown*, 78 F.4th at 128; *Bond*, 56 F.4th at 383; *Bethea*, 54 F.4th at 831.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief."  *Bethea*, 54 F.4th at 831 (citation omitted); *see also Davis*, 2024 WL 1662931, at *2; *Bond*, 56 F.4th at 383; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021).  If that criterion is met, the court "must then find that release is appropriate under the

18 U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable." *Bethea*, 54 F.4th at 831; *see also Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021); *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169. However, as the Fourth Circuit has recognized, "when deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)). So, "the court must determine whether the requested reduction in sentence is consistent with 'applicable policy statements issued by the Sentencing Commission.'" *Davis*, 2024 WL 1662931, at *2; *see Jenkins*, 22 F.4th at 169. But, as the Fourth Circuit observed in *Davis*, 2024 WL 1662931, at *3, "until recently . . . there were no applicable policy statements to reference." That changed with amendments that went into effect on November 1, 2023.

The Policy Statement codified at U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)" ("Policy Statement"). Prior to amendments that took effect on November 1, 2023, the Policy Statement began: "Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. 1B1.13 (2021). This text did not reflect changes that were brought about with the passage of the 2018 FSA. Interpreting the pre-amendment language in *McCoy*, 981 F.3d at 282, the Fourth Circuit stated that, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." Therefore, on the basis of the text, the Court said: "When a defendant exercises his . . . right to move for compassionate release on his own

behalf, § 1B1.13 does not apply, and thus § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of district courts." *McCoy*, 981 F.3d at 281.  As a result, district courts were "empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

However, as noted, effective November 1, 2023, the Policy Statement was amended.  *See* Sentencing Guidelines for United States Courts, 88 Fed. Reg. 28254 (May 3, 2023) (providing notice of amendments to Congress).  The amendments took into account the enactment of the 2018 FSA.  As a result of the amendments that took effect on November 1, 2023, the Policy Statement now begins: "Upon motion of the Director of the Bureau of Prisons *or the defendant* pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2023) (emphasis added).  Thus, the Policy Statement is now expressly applicable to defendant-filed motions under § 3582(c)(1)(A).  *Davis*, 2024 WL 1662931, at *4; *Cf. McCoy*, 981 F.3d at 282.

The decision in *McCoy*, 981 F.3d 271, was based on a version of the Policy Statement that has been amended.  And, for that reason, it appears that the Fourth Circuit's conclusion in *McCoy*, 981 F.3d at 281, to the effect that "§ 1B1.13 is not an 'applicable' policy statement," is no longer consistent with the Guidelines, as amended.  Specifically, this is because the Policy Statement is now expressly applicable to defendant-filed motions pursuant to 18 U.S.C. § 3582(c)(1)(A).[6]

---

[6] Defendant's Motion was filed on September 25, 2023, before the amendments to U.S.S.G. § 1B1.13 took effect.  *See* ECF 1195.  But, the Court applies the law in effect at the time of its decision, not the law in effect at the time the Motion was filed.  *Cf., Maryland Shall Issue, Inc. v. Governor Wes Moore*, 86 F.4th 1038 (4th Cir. 2023) (ruling in accordance with law in effect at the time of the appellate decision, not the law in effect at the time of the district court's decision).  In any event, the Court would reach the same outcome under the law in effect before the amendments of November 1, 2023.

As a result, in addition to the two criteria discussed earlier (extraordinary and compelling reasons and 18 U.S.C. § 3553(a) factors), a court must ensure that any sentence reduction "is consistent with" the Policy Statement's provisions. 18 U.S.C. § 3582(c)(1)(A).   The Policy Statement provides, in part, U.S.S.G. § 1B1.13(a):

> (B) IN GENERAL.—Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> > (1) (A) extraordinary and compelling reasons warrant the reduction; or
> >
> > (B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;
> >
> > (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
> >
> > (3) the reduction is consistent with this policy statement.

The Policy Statement identifies six circumstances that, individually or in combination, may constitute "extraordinary and compelling reasons" for a reduction in sentence.  *Id.* § 1B1.13(b)(1)– (6).  These include certain medical circumstances of the defendant, such as a terminal illness, "serious cognitive impairment," the inability to receive specialized medical care while incarcerated, or housing of a defendant at a correctional facility affected or at imminent risk of being affected by "an ongoing outbreak of infectious disease" or "an ongoing public health emergency . . . .", *id.* § 1B1.13(b)(1)(A), (B), (C), (D); the defendant's age, *id.* § 1B1.13(b)(2); the defendant's family circumstances, *id.* § 1B1.13(b)(3)(A), (B), (C), (D); the fact that the defendant, while in custody, was the victim of sexual or physical abuse committed by, or at the direction of,

a correctional officer, *id.* § 1B1.13(b)(4)(A), (B); for a defendant who received an "unusually long sentence" and has served at least ten years of the sentence, the court may consider a non-retroactive change in the law in determining whether there is an extraordinary and compelling reason, but only if the change in law would "produce a gross disparity" with "the sentence likely to be imposed at the time the motion is filed . . . .", § 1B1.13(b)(6); and "any other circumstances or combination of circumstances . . . similar in gravity to" the circumstances "described in paragraphs (1) through (4)." *Id.* § 1B1.13(b)(5).

Prior to the amendments in November 2023, the district court was obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389, 2396 (2022); *Troy*, 64 F.4th at 184; *United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023); *United States v. Brice*, 2022 WL 3715086, at *2 (4th Cir. Aug. 29, 2022) (per curiam); *McCoy*, 981 F.3d at 285-86. Where appropriate, the district court had to "account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *United States v. Mangarella*, 57 F.4th 197, 203 (4th Cir. 2023); *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n.3. However, such developments did not warrant a recalculation of the Guidelines. *Troy*, 64 F.4th at 184.

In this regard, § 1B1.13(c) is relevant. Titled "Limitation on Changes in Law," it states that, "[e]xcept as provided in subsection (b)(6)," which concerns an "unusually long sentence," "a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement." However, "if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under [the

Policy Statement], a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction." *Id.*; *see Davis*, 2024 WL 1662931, at *3.

Section 1B1.13(d) of the Policy Statement, which concerns rehabilitation, is also relevant. It provides that, "[p]ursuant to 28 U.S.C. §994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." *Id.* Nevertheless, "rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." *Id.*

As mentioned, even if a defendant establishes that extraordinary and compelling reasons warrant relief, the court must also consider the sentencing factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826–27 (2010); *Brown*, 78 F.4th at 128; *Mangarella*, 57 F.4th at 200, 203; *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see Kibble*, 992 F.3d at 329–30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d at 693–94 (district court must give due consideration to the § 3553(a) factors); *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors

counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion).  Notably, the recent amendments to the Guidelines did not alter this requirement.

The § 3553(a) "factors include 'the nature and circumstances of the offense'; 'the history and characteristics of the defendant'; and the need for the sentence to 'provide just punishment,' 'afford adequate deterrence,' 'protect the public from further crimes of the defendant,' and 'provide the defendant with . . . training, medical care, or other correctional treatment.'" *Jenkins*, 22 F.4th at 170 (quoting 18 U.S.C. § 3553(a)).  As the Fourth Circuit has observed, "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'" *Bond*, 56 F.4th at 384 (quoting *Jackson*, 952 at 500).  The district courts "enjoy the discretion to give additional weight to any one factor so long as they do not confine their analysis to that factor."  *Davis*, 2024 WL 1662931, at *4; *see United States v. Friend*, 2 F.4th 369, 381-82 (4th Cir. 2021).  And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain.  *Bond*, 56 F.4th at 384–85.

Section 3553(a)(6) directs the court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." Under this factor, a change in the Guidelines or the law, even if not retroactive, could lead to a finding of a sentencing disparity.  *Davis*, 2024 WL 1662931, at *8, *9.  In *Davis*, the Court pointed to a change in "the legal landscape" with regard to career offender status and Amendment 782.  *Id.* *8.  It noted that, if Davis were sentenced today, his Guidelines would have been substantially lower than when he was sentenced, and he would likely be out of prison.  The Court said, *id.* at *9:  "That reality alone implicates" 18 U.S.C. § 3553(a)(6).

The *Davis* majority also said, 2024 WL 1662931, at *6: "Nonretroactive changes in law remain relevant when a court has to decide when and how to modify a sentence." Moreover, the *Davis* Court concluded that the district judge abused his discretion by "overlooking" defendant's evidence of rehabilitation. *Id.* at *7. It observed that while "rehabilitation *alone* cannot be considered an extraordinary and compelling reason for release, it may be considered as one factor among several" in determining whether a sentence reduction is warranted. *Id.* (emphasis in *Davis*).

"A district court need not provide an exhaustive explanation analyzing every § 3553(a) factor." *Jenkins*, 22 F.4th at 170. Nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Id.*; *see Chavez-Meza v. United States*, 585 U.S. 109, 113 (2018); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167; *see also Brown*, 78 F.4th at 132 (criticizing district judge's "cursory" consideration of the § 3553(a) factors); *United States v. Dillard*, 891 F.3d 151, 158 (4th Cir. 2018). And, "'the record as a whole'" must demonstrate that the judge considered the parties' contentions and had "'a reasoned basis'" for the exercise of judicial discretion. *Malone*, 57 F.4th at 176 (citations omitted); *see also United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

That said, "[h]ow much explanation is 'enough' depends on the complexity of a given case." *Gutierrez*, 2023 WL 245001, at *3; *see Chavez-Meza*, 585 U.S. at 116; *United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021). In *Davis*, because the sentence disparity was "so stark, and the change in law so substantial," the Court reasoned that "a detailed explanation" was required by the district judge in regard to its analysis. *Id.* (citing *Chavez-Meza*, 585 U.S. at 119).

Therefore, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*). In providing such an explanation, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling." *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332. In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

### III. COVID-19
### A.

Health officials confirmed the first case of COVID-19 in the United States on January 31, 2020.[7] *United States v. Pair*, 84 F. 4th 577, 580 (4th Cir. 2023) (citation omitted). Then, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[8] Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic. *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19)*, TRUMP WHITE HOUSE (Mar. 13, 2020), https://perma.cc/WF55-8M4P. That declaration was extended on several occasions. *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

---

[7] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[8] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://perma.cc/24J3-UQZN.

The pandemic spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam). Indeed, for a significant period, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, 462 F. Supp. 3d 746, 752–53 (E.D. Mich. 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). Schools and businesses were closed, or operated on a limited basis, in an effort to thwart the spread of the virus, which is extremely contagious. *Pair*, 84 F.4th at 589; *see Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, Ctrs. for Disease Control & Prevention (August 11, 2022), https://perma.cc/QGL2-3URS. As the Fourth Circuit has put it, in the early months of 2020, "a new reality set in. Nations around the world announced stringent limitations on in-person interaction . . . businesses ground to a halt; and death tolls mounted." *Pair*, 84 F.4th at 580.

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.* Nevertheless, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020), *abrogation on other grounds recognized by United States v. Phillibert*, 557 F. Supp. 3d 456 (S.D.N.Y. 2021) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

People infected with the coronavirus sometimes experience only mild or moderate symptoms.  But, particularly at the outset of the pandemic, the virus caused severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).  On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden Marks One Million U.S. COVID Deaths After Losing Political Battles*, REUTERS (May 12, 2022), https://perma.cc/TLA5-YNFB.  And, as of March 10, 2023—the last day on which Johns Hopkins University updated its COVID-19 data—more than 103.8 million Americans had been infected with COVID-19.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://perma.cc/J7XS-FYHT.

The Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and has repeatedly revised its guidance concerning medical conditions that pose a greater risk of severe illness due to COVID-19.  The CDC most recently updated its guidance in May 2023 to reflect the most current data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 11, 2023), https://perma.cc/923J-T5P8.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities such as Down syndrome; heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; having a BMI 25 or

higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://perma.cc/VG23-TQMM. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

**B.**

As noted, the coronavirus is "highly contagious." *Pair*, 84 F.4th at 589. At the outset of the pandemic, some of the "measures we now know to be useful in combating the spread of the virus (such as masking, separation . . . and vaccinations) were either nascent or, as in the case of vaccines, unavailable." *Id.* Nevertheless, in an effort to prevent the spread of COVID-19, the CDC urged, *inter alia*, the practice of "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (Jan. 26, 2023), https://perma.cc/UJ98-2V6S; *see also Pair*, 84 F.4th at 585.

However, social distancing and "rigorous personal hygiene," which are "important combatants to the virus," are particularly difficult in the penal setting. *Seth*, 461 F. Supp. 3d at 248. Indeed, prisoners have little ability to protect themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of

infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020), https://perma.cc/3RHL-WNKU.  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We Do Not Feel Safe,'* WASH. POST (Aug. 24, 2020), https://perma.cc/K6SW-LFGX (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep.  Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to limit their spread.  *See Coreas v. Bounds*, TDC-20-0780, 451 F. Supp. 3d 407, 413 (D. Md. 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021), https://perma.cc/TR7Q-8H9J ("The cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease.  Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519–20 (2011) (referencing a

medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, "in recognition of [the] stark reality" that COVID-19 posed substantial challenges to incarcerated individuals, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 461 F. Supp. 3d at 248. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."

Thereafter, on March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the

increased use of home confinement.  The memorandum provided that the BOP should prioritize for review for home confinement eligibility those inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

### C.

There is no cure for the coronavirus.  But, much has changed since the coronavirus first emerged in early 2020.  Medical therapies have continued to improve and vaccines are now generally available.  *See Stay Up to Date with COVID-19 Vaccines*, CENTERS FOR DISEASE CONTROL & PREVENTION (Oct. 4, 2023), https://perma.cc/VZ77-KN7W.  Although the vaccines do not appear to prevent illness, they do seem to reduce the seriousness of the illness.

On January 4, 2021, at about the time the first vaccines became available, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021), https://perma.cc/P4KL-PEZW. It provided that administration of the COVID-19 vaccines (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.  The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://perma.cc/2FF2-G6PX.

As of May 11, 2023—the last day on which the CDC updated its vaccine tracker—approximately 69% of the total U.S. population had completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up.

*See COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://perma.cc/B2KG-M4E3 (final update May 11, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://perma.cc/6W5Q-55DR (final update May 11, 2023).

### D.

In an interview in September 2022 on the CBS television show "60 Minutes", President Biden declared that the pandemic was "over" in the United States.  Alexander Tin, *Biden Says Covid-19 Pandemic is "Over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over.  We still have a problem with COVID.  We're still doing a lotta work on it . . . .  But the pandemic is over."  *Id*.  And, on April 10, 2023, President Biden signed into law House Joint Resolution 7, "which terminate[d] the national emergency related to the COVID-19 pandemic."  Pub. L. No. 118-3, 137 Stat. 6 (2023).

Since the virus first emerged, it has changed repeatedly, with multiple strains and variants.  But. the data suggests that COVID-19 has not disappeared.  *See COVID Data Tracker*, CNTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last updated Apr. 27, 2024).  Moreover, available data may not provide a full picture of COVID-19's spread, because "[s]ince the end of the public health emergency on May 11, 2023, data that has been crucial to understanding the spread and impact of Covid is reported by government sources less frequently, or is no longer reported at all."  *Track Covid-19 in the U.S.*, THE NEW YORK TIMES,   https://www.nytimes.com/interactive/2023/us/covid-cases.html (last updated Dec. 4, 2023).

To establish that the risk posed by COVID-19 presents an extraordinary and compelling reason for release, a "defendant must allege that the risk of contracting COVID-19 is higher in

prison than outside of it, and that his preexisting conditions increase the risk of experiencing a serious or fatal case of the virus." *Davis*, 2024 WL 1662931, at *4; *see Brown*, 78 F.4th at 128; *see also High*, 997 F.3d at 185. Notably, this "inquiry is multifaceted and must account for the totality of relevant circumstances." *Bethea*, 54 F.4th at 832 (internal quotations marks omitted). The Court must determine whether the movant "shows both a particularized susceptibility to COVID-19 and a particularized risk of contracting the disease at his prison facility." *Hargrove*, 30 F.4th 189, 196 (4th Cir. 2022) (cleaned up).

The Amendments to the Policy Statement are also relevant. As the *Davis* Court has said, 2024 WL 1662931, at *3, "a defendant's increased risk of suffering complications or death from exposure to disease during a public health emergency can be an extraordinary and compelling reason for release."

### III. Discussion

### A. Defendant's Medical Conditions

I have twice found that, based on Robinson's various medical conditions, he satisfies the threshold requirement for "extraordinary and compelling" grounds for compassionate relief. I see no reason to rule differently at this juncture.

Robinson's medical records previously indicated that he suffers from several serious medical ailments. These include hypertension, diabetes, and kidney disease. ECF 1006-1 at 6. He also claims in the Motion that he suffers from several health conditions that have been "untreated since 2020[.]" ECF 1195 at 4. These include an alleged lesion on his kidney, a cyst on his left wrist, "broad line Diabetes" and "Kidney Failure." *Id.* The defendant's assertion of a lack of treatment is at odds with the medical records.

25

The government submitted over 200 pages of defendant's medical records from 2022 and 2023.  ECF 1213.  As of December 5, 2022, and again on February 1, 2023, the record reflects: "Chronic Kidney disease, stage 2 (mild), N182-Resolved".  *Id.* at 62, 102.  However, I saw no reference to a lesion on the kidney.  Defendant was also noted to have hypertension, prediabetes, and intermittent edema.  *Id.* at 62.  On July 13, 2023, he was considered "at risk for chronic narrow angle glaucoma . . . ."  *Id.* at 34.  In September 2023, the BOP assessed the defendant with the treatment goal of "Minimize Harm from Ongoing Illicit Opioid Use" and "Use of Illicit Suboxone on the compound."  *Id.* at 18.

The records also reflect a cyst on defendant's left wrist, diagnosed at least by December 5, 2022.  *Id.* at 100; *see also id.* at 34, 40, 48-49, 79-80, 100.  A ganglionic cyst was suspected on June 5, 2023, and an ultrasound was ordered.  *Id.* at 39.  On July 13, 2023, imaging showed a "2cm ovoid soft tissue lesion."  *Id.* at 34.  The exam on July 13, 2023, also reflects another ultrasound request for the left wrist, "unspecified glaucoma narrow angle," hypertension, edema, and severe opioid use disorder, as well as low back pain.  *Id.* at 79.  Moreover, the records reference defendant's prediabetes.  *See*, *e.g.*, *id.* at 62, 102, 167.

The defendant argues that the BOP is known for its poor medical care.  He asserts:  "The BOP is known for their negligent medical care."  ECF 1195 at 4.  Robinson's concern about the quality of the medical care he is receiving from the BOP is not an extraordinary and compelling reason to justify compassionate release to the defendant.  But, the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person."  *People with Certain Medical Conditions*, *supra*.

Numerous judges have found extraordinary and compelling circumstances for defendants with multiple chronic medical conditions, such as those applicable to Robinson.  *See*, *e.g.*, *United*

*States v. Azianbidji*, PWG-17-253, 2021 WL 307416, at *1 (D. Md. Jan. 29, 2021) (defendant with hyperlipidemia, hypertension, and obesity); *United States v. White*, CCB-09-369, 2020 WL 3960830, at *2-3 (D. Md. July 10, 2020) (defendant with neutropenia, hyperlipidemia, hypertension, heart disease, chronic kidney disease, and obesity); *Hilow*, 2020 WL 2851086, at *4 (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Quintero*, 458 F. Supp. 3d 130, 132 (W.D.N.Y. 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension constituted an extraordinary and compelling reason); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (concluding that defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason).  There are also some cases in which courts have found extraordinary and compelling circumstances when hypertension is the sole condition. *See, e.g.*, *United States v. Salvagno*, 456 F. Supp. 3d 420, 423, 427-29 (N.D.N.Y. 2020); *United States v. Sawicz*, 453 F. Supp. 3d 601, 604-05 (E.D.N.Y. 2020).

The fact that Robinson has been vaccinated against COVID-19 "does not negate that his underlying health conditions make him eligible for compassionate release." *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021).  As Judge Grimm said in *United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021): "It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues."  Therefore, the fact of vaccination or prior infection does not eliminate concerns about underlying health conditions that might otherwise render an individual eligible for compassionate release.

Moreover, several judges of this Court have concluded that an inmate is eligible for compassionate release, notwithstanding his vaccination status. *See e.g.*, *United States v. Hegie*,

RDB-14-411, 2022 WL 605383, at *2 (D. Md. Mar. 1, 2022) (finding that, in light of the COVID-19 pandemic, a fully vaccinated defendant who suffered from obesity and asthma presented an extraordinary and compelling reason for his release); *United States v. Coleman*, PWG-17-393, WL 356724, at *3 (D. Md. Feb. 7, 2022) (determining that, in light of the dynamic nature of the COVID-19 pandemic and the absence of any information concerning the inmate's vaccination status, defendant's underlying medical conditions qualified as an extraordinary and compelling reason for his release); *United States v. Rivas*, TDC-19-0417, 2022 WL 36941, at *2 (D. Md. Jan. 4, 2022) (explaining that vaccinated defendant who was a paraplegic and suffered from frequent urinary tract infections could satisfy the extraordinary and compelling prong of the analysis).

"At the end of the day, district judges are not epidemiologists." *United States v. Sherrod*, 19-20139, 2021 WL 3473236, at *5 (E.D. Mich. Aug. 6, 2021).  In light of the evolving circumstances regarding COVID-19, coupled with defendant's medical issues, Robinson's vaccination status does not render him ineligible for compassionate release.  *See Palmer*, 2021 WL 3212586, at *3 (noting that it is not possible "to predict the impact of the vaccines on future strains of the virus . . . .").

That defendant already had COVID-19 does not preclude a finding of extraordinary and compelling circumstances.  In other words, a defendant's eligibility for compassionate release is not defeated because a defendant has already experienced COVID-19.  What Judge Chuang said in *United States v. Fletcher*, TDC-05-0179, 2020 WL 3972142, at *3 (D. Md. July 13, 2020), is apt: "Although [the defendant] may now be less vulnerable or immune from coronavirus, there is no certainty about whether individuals who have already had COVID-19 now have immunity."  *See also United States v. Heyward*, PWG-17-0527, 2020 WL 3547018, at *2 (D. Md.

June 30, 2020) (noting in grant of compassionate release to individual who had survived the virus "that a secondary contraction of COVID-19 is possible").

Moreover, the future trajectory of the COVID-19 pandemic is anything but predictable. In particular, the Court is mindful that the CDC has confirmed that breakthrough infections of COVID-19 among vaccinated individuals occur and, albeit in rare cases, they can result in death. *See Rates of COVID-19 Cases and Death by Vaccination Status*, CTRS. FOR DISEASE CONTROL & PREVENTION, Mar. 17, 2022, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last accessed May 11, 2022). Indeed, an analysis of "nationwide data from the Center for Disease Control and Prevention" revealed that "[t]he vaccinated made up 42 percent of fatalities in January and February [of 2022,] during the highly contagious omicron variant's surge, compared with 23 percent of the dead in September, the peak of the delta wave." Fenit Nirappil & Dan Keating, *Covid deaths no longer overwhelmingly among the unvaccinated as toll on elderly grows*, Wash. Post (Apr. 29, 2022), https://www.washingtonpost.com/health/2022/04/29/covid-deaths-unvaccinated-boosters/.

As I have said, I have twice found that defendant's multiple health conditions render him eligible for compassionate release. I reach the same conclusion once again. Nevertheless, that Robinson satisfies the "extraordinary and compelling" prong of the § 3582 analysis does not end the inquiry.

### B.  Section 3553(a) Factors

When, as here, a court finds extraordinary and compelling reasons for compassionate release, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of factors set forth in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186; *see also United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam). These factors include: (1) the nature and

29

circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, provide just punishment, and protect the public from further crimes of the defendant; (3) the kinds of sentences available and the applicable Guidelines range; (5) any pertinent Commission policy statements; and (6) the need to avoid unwarranted sentence disparities. *High*, 997 F.3d at 186.

In my view, a balancing of the § 3553(a) factors indicates that defendant's release from prison is not warranted at this time. However, I will grant the defendant a one-year reduction in his sentence.

As the government observes, Robinson's crime of conviction was a serious one. Defendant was the leader of a large drug trafficking organization and was convicted of conspiracy to distribute more than one kilogram of heroin from March of 2017 through January of 2018. ECF 201, ¶ 6(a). Accordingly, I agree with the government that the nature of Robinson's offense weighs heavily here.

Defendant contends that he should receive a reduction in sentence because his case was "fast-tracked." But, the government responds, ECF 1211 at 12-13: "Any benefit the Defendant received was given to him as a part of the Government's sentencing recommendation. And more importantly, this is not a justification for him to receive a sentence reduction."

In my view, there is no basis for the Court to conclude that defendant's sentence is disparate. Congress set a mandatory minimum sentence of ten years for this offense. The sentence of twelve years, to which defendant agreed in the C Plea, was well below the applicable Guidelines. Moreover, there is no change in the law that impacts the calculation of the Guidelines, or that

would suggest that, if defendant were sentenced today, his sentence would be any different than the one he received.

Furthermore, defendant's criminal history is substantial and troubling.  Over the years, the criminal justice system was generally quite lenient with defendant.  He received multiple suspended sentences or short sentences.  *See, e.g.*, *id.* ¶¶ 24-27, 31, 33.  And, there is parole in the Maryland state system.  For example, ECF 238, ¶ 30 reflects that defendant was mandatorily released after serving just over two years of a four-year sentence.  Yet, defendant continued down the wrong path; leniency did not work.

Indeed, defendant's prior record reveals a serious pattern of recidivism.  In particular, the Amended PSR reflects nine convictions between 1989 and 2012.  *See* ECF 238, ¶¶ 24-31, 33.

On the other hand, the federal sentence that defendant received is a lengthy one, even if it was well below the Guidelines.  Robinson's Guidelines were affected by his career offender designation.

Defendant has already served about 75 months of his 144-month sentence of incarceration.  I consider it salient that the time Robinson has already served in prison for this offense exceeds any prior sentence that Robinson ever served.

Defendant acknowledges his "stupid mistakes" (ECF 1218 at 3), and expresses remorse for his conduct.  He points to his rehabilitation and participation in multiple programs at the BOP, involving drug treatment and education, and claims that he has a job that awaits him on release.  ECF 1218 at 2.  Robinson claims that, as of September 2023, he was enrolled in a GED program.  ECF 1195 at 5.  He does not mention the status of his GED in his submission of March 14, 2024.  ECF 1225.  But, he recognizes that he is in need of treatment "for his relapse due to drug addicts

[sic] while incarcerated . . . ."  *Id.* at 3.  Robinson notes that he is currently enrolled in drug treatment.  *Id.* at 11.

The Court applauds Robinson for his positive efforts to return to society.  But, "rehabilitation alone cannot serve as a basis for compassionate release."  *Davis*, 2022 WL 127900, at *1.  That said, I can consider it in combination with other circumstances.  *Id.*; *see* Policy Statement § 1B1.13(d).

Notably, defendant acknowledges five infractions in 2022.  ECF 1218 at 2.  These include possession of an unauthorized item and possession of a hazardous tool.  *Id.*  These infractions militate against the requested two-year reduction.

As I see it, the requested reduction of two years would not promote respect for the rule of law.  But, because of defendant's health problems, the length of time served, and his efforts at rehabilitation, I will grant a one-year reduction.

The FSA "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'"  *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020).  Indeed, the statutory text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons."  18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in both this Circuit and others have granted sentence reductions without immediate release. *See, e.g.*, *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733, at *5 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37–38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United*

*States v. Arey*, Crim. No. 5:05-00029, 461 F.Supp.3d 343, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); see *also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . . .").

## IV.    Conclusion

In sum, the Court remains troubled by the serious nature of defendant's offense of conviction, Robinson's role in the offense, and his criminal history, reflecting his repeated failure to conform his conduct to societal expectations.  But, for the reasons stated, a one-year reduction in defendant's sentence is appropriate.

An Order follows, consistent with this Memorandum Opinion.


Date:  May 6, 2024                                    _____/s/_____

                                                             Ellen L.  Hollander
                                                             United States District Judge